FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 APR 18  PM 4: 21

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NORTH AMERICAN CAPACITY | * | CIVIL ACTION NO. 00-0429 |
| INSURANCE COMPANY | * | |
| | * | |
| VERSUS | * | JUDGE ELDON E. FALLON |
| | * | |
| BRISTER'S THUNDER KARTS, INC. | * | MAGISTRATE: SECT. L, MAG. 2 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PALOMAR'S MOTION TO DISMISS AND MEMORANDUM IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

MAY IT PLEASE THE COURT:

Third party defendant, Palomar Insurance Company, supplements its Motion to Dismiss and opposes third party plaintiff, Brister's Thunder Karts, Inc.'s (Brister's) Motion for Judgment on the Pleadings on the grounds that Brister's has not suffered any damages, coverage eists for the claims made against Brister's, and that genuine issues of material fact preclude any judgment as a matter law that would find that Palomar Insurance Company ("Palomar") should be declared to provide coverage due to its alleged failure to notify another party of the alleged loss.

### BACKGROUND

This Declaratory Judgment action involves a dispute as to which insurance company provided coverage to Brister's for claims asserted in the matter entitled and captioned *Roland J. LeBlanc, et al vs. Brister's Thunder Karts*, which is a personal injury action pending in State Court in St. Martin Parish, State of Louisiana. North American Capacity Insurance Company ("North American") filed a Declaratory Judgment action against Brister's seeking to have its obligation to



Fee
Process
X  Dktd
CtRmDep
Doc.No.

provide insurance coverage terminated. North American's policy to Brister's had allegedly lapsed or expired at the time the personal injury claim was filed against Brister's. However, after North American was notified of the loss it provided coverage. North American assigned a defense attorney to defend Brister's, who undertook a vigorous defense of the personal injury action. Years later when North American realized its mistake, it filed this Declaratory Judgment action.

Great American Insurance Company, doing business as American Dynasty ("Great American"), provided insurance coverage to Brister's at the time of the personal injury claim. Brister's named Great American as a third party defendant and also seeks to have a judgment entered against Great American on the pleadings. As correctly pointed out by Brister's in its Motion for Judgment on the Pleadings, Great American's policy provided coverage to Brister's at the time of the loss and for the claims asserted in the State law case. Great American was not immediately notified of the loss, because North American had assumed the defense of the matter. However, this does not diminish Great American's duty to defend and cover Brister's for the loss.

Brister's also added Palomar as a third party defendant in this matter seeking to have it found negligent for notifying North American of the loss. Palomar filed a Motion to Dismiss the Declaratory Judgment action against it on the grounds that a Declaratory Judgment is not appropriate against Palomar. Brister's now seeks to have a judgment entered on the pleadings against Palomar under the broad allegation that Palomar should be declared to provide coverage simply because they were alleged to have failed to provide notice to the proper party. Brister's does not provide any legal or evidentiary support for this broad proposition, and its Motion for Judgment on the Pleadings should be denied.

2

## LAW AND ARGUMENT

Federal Rules of Civil Procedure, Rule 12(c) provides that after the pleadings are closed, but within such time as not to delay the trial, any party may move for a judgment on the pleadings. If on a Motion for Judgment on the Pleadings, matters outside of the pleadings are presented to and not excluded by the Court, the Motion shall be treated as one for Summary Judgment and disposed of as provided in Rule 56 .... Brister's has submitted matters outside of the pleadings and therefore, its Motion for Judgment on the Pleadings should be considered as a Motion for Summary Judgment.

Summary Judgment is appropriate only if "the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d. 202 (1986). In determining whether there is any genuine issue of material fact, the court in *Reese v. Anderson,* 926 F.2d. 494 (5th Cir. 1991) cited the often-referred to decision of *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d. 265 (1986) wherein it was stated that a properly supported summary judgment motion requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. The Fifth Circuit said the key teaching of *Celotex* is that the party responding to a summary judgment motion must support her response with specific, non-conclusory affidavits or other competent summary judgment evidence. All inferences are drawn from the evidence in the light most favorable to the non-moving party. *Ins.*

3

*Co. of North America v. Dealy,* 911 F.2d. 1096 (5th Cir. 1990). In this case all inferences must favor Palomar.

In this case, Brister's has failed to submit any evidence or law which would support a finding against Palomar due to its alleged failure to notify the proper insurance carrier. On the other hand, the evidence and law supports a finding that either North American or Great American should be deemed to have provided coverage to Brister's for the loss and ordered to defend and indemnify Brister's for any loss occasioned in the State personal injury action. The law further establishes that Palomar should be dismissed from this proceeding.

## I. BRISTER'S KNEW THAT THE WRONG INSURANCE COMPANY HAD BEEN NOTIFIED OF THE LOSS

The cornerstone of Brister's allegations against Palomar is that it allegedly notified the wrong insurance carrier of the loss. However, Brister's knew that the wrong insurance carrier had been notified, but did not take any steps to remedy the defective notice. In Brister's corporate deposition, its Chief Financial Officer, Mr. Edward Cook, testified with regard to the insurance coverage provided at the time of the loss. Brister's representative testified that it had a copy of the North American policy. (See deposition of Brister's attached as Exhibit "A"). Brister's was also aware that the producer and general agent for North American was American Marketing Center. (See Exhibit "A"). Brister's representative acknowledged that it knew that the North American policy was cancelled effective July 29, 1996. (See Exhibit "A"). Despite its knowledge that the North American policy had been cancelled before the personal injury accident, Brister's acquiesced and did not take any action to prevent the alleged improper notice when it received a copy of a fax

4

to American Marketing Center placing it on notice of this loss. (See Exhibit "A"). Birster's Chief Financial Officer essentially admitted that Brister's knew or should have known the entire time that the allegedly wrong insurance company was being placed on notice of this claim, but acquiesced after the insurance company began to defend this action.

Brister's acquiescence went beyond simply not telling Palomar. Brister's had a $25,000.00 deductible under its North American policy. (See Exhibit "A"). Under the terms of the policy, Brister's was required to pay its outside defense counsel and make other payments until it had satisfied its deductible. Though it knew or should have known that the North American policy had expired, Brister's made payments under its deductible to its defense counsel, Ms. Mary Hamilton of the law firm Voorhies and Labbe/. (See Exhibit "A"). Brister's would have continued to operate under this arrangement without notifying Palomar had North American not filed this Declaratory Judgment action.

The evidence establishes that Brister's knew that the wrong insurance company was defending this case, but took no action. Palomar should therefore be dismissed. At a minimum, and for purposes of Palomar's opposition to Brister's Motion for Summary Judgment it is sufficient to note that there are  material facts which are in dispute which preclude Summary Judgment in favor of Brister's and against Palomar.

## II.  BRISTER'S IS ESTOPPED FROM ASSERTING A CLAIM AGAINST PALOMAR, BECAUSE PALOMAR DETRIMENTALLY RELIED ON THE ACTIONS OF BRISTER'S AND OTHERS IN THIS CASE

Equitable estoppel arises where a person by his acts, representations, or admissions,

5

intentionally, or negligently induces another to believe that certain facts exist, and that the other person rightfully relies and acts on such belief, and will be prejudiced if the former is permitted to deny the existence of such facts. *Shirley v. Campbell*, 151 So.2d. 557 (La.App. 2nd Cir.).

As previously noted, Brister's and North American acted in a manner that suggested to Palomar that it had notified the proper insurance company of the loss. Had Brister's notified Palomar or North American that its coverage was cancelled, Palomar would have immediately notified Great American of the loss.

North American instead decided to appoint its own counsel to defend this loss, until filing the Declaratory Judgment action. Brister's continued to pay those defense bills in the hopes of satisfying its deductible and discharging its obligations under North American's policy. Presumably, Brister's and North American worked closely to defend the personal injury action. At no time did either tell Palomar that may be a problem with the insurance notice. The actions and representations of Brister's and North American induced Palomar to believe that coverage was secured by North American. Brister's and North American should be estopped from denying coverage or seeking to hold Palomar accountable for any alleged improper notice in this case.

### III. BRISTER'S HAS NOT SUFFERED ANY DAMAGES DUE TO PALOMAR'S ALLEGED IMPROPER NOTICE

One of the key elements in any claim is the existence of damages. Palomar has asserted that this Declaratory Judgment action is improper, because Brister's seeks an Order from this Court finding it negligent and responsible for damages. However, assuming Brister's Declaratory Judgment action against Palomar is appropriate, Brister's claim must fail, because it has not suffered

6

and damages, which is a key element to any claim.

In its deposition, Brister's admitted that it had not suffered any damages:

> Q:    Are you aware of any damages that Brister's Thunder Karts has sustained as a result of the notification to North American Capacity Insurance Company?
>
> A:    I'm not sure what you are asking me.
>
> Q.    Has Brister's Thunder Karts suffered any loss as a result of the original notification of this accident or the LeBlanc loss going to American Marketing Center versus going to American Dynasty?
>
> A.    I'm not aware that we have.  (See Exhibit "A").

Accordingly, Brister's has not suffered any damages in this case and therefore cannot assert a claim against Palomar.

### IV.  SUMMARY JUDGMENT SHOULD BE DENIED, BECAUSE EITHER NORTH AMERICAN OR GREAT AMERICAN PROVIDED INSURANCE COVERAGE IN THIS CASE

North American has continued to provide a defense of this case.  While it seeks to have its obligation to continue to provide insurance coverage terminated, for the reasons more fully set forth in the opposition to its Motion for Summary Judgment, North American should be deemed the insurer of Brister's in this case.[1]  Alternatively, Great American clearly provided a policy of insurance, which was in full force and effect at the time of the loss.  Regardless of the outcome of North American's Motion for Summary Judgment, this Court must conclude that Brister's had insurance coverage through Great American at the time of this loss.  Great American should be

---

[1] Palomar adopts the Memorandum submitted by Great American in opposition to North American's Motion for Summary Judgment.

called on to defend and indemnify Brister's for any loss sustained in the State personal injury action.

With insurance coverage provided by North American and Great American, Brister's cannot maintain any action against Palomar in this case. Accordingly, Brister's Third Party Demand against Palomar must be dismissed.

## CONCLUSION

Brister's Thunder Karts was provided insurance coverage by North American Capacity Insurance Company, or Great American Insurance Company, doing business as American Dynasty Surplus Lines Insurance Company. There is no dispute that North American engaged in the course of conduct that led everyone to believe that it was the insurance carrier at the time of the loss. Regardless of the outcome of North American's Motion for Summary Judgment, it is undisputed that Great American provided insurance coverage to Brister's at the time of the loss. Either North American, Great American, or both should be deemed the insurance carrier for Brister's and should provide coverage to Brister's for the state tort claims. A finding of coverage in favor of Brister's precludes any judgment against Palomar. Further, Brister's has not suffered any damages as a result of Palomar's alleged failure to provide proper notice.

With regard to notice, it was established by Brister's corporate representative that they were aware of the cancellation of insurance, but took no action. Brister's either knowingly, or unwittingly engaged in the course of conduct with North American that suggested to Palomar that coverage was in place. Those facts support dismissal of all claims against Palomar. At a minimum, those facts preclude Summary Judgment in favor of Brister's and against Palomar.

Accordingly, Palomar Insurance Company respectfully requests that this Honorable Court

8

dismiss all claims against it. Alternatively, Palomar respectfully requests that this Court deny

Brister's Motion for Judgment on the Pleadings, or Motion for Summary Judgment.

Respectfully submitted,

**BARRY, PICCIONE & DYESS**

STEPHEN R. BARRY (#21465) T.A.
*A Professional Law Corporation*
829 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-9322

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon counsel for all parties

by mailing the same to each properly addressed and postage prepaid on this _18th_ day of

_April_ , 2001.

STEPHEN R. BARRY

9

1  have done?

2      A.    It might be like mail a copy of this to

3  another attorney that's out of state that's

4  working something for us.  That's the only one

5  that comes to mind right now.

6      Q.    And you don't know the procedure that was

7  employed when the LeBlanc lawsuit came to your

8  predecessor?

9      A.    I don't have any personal knowledge about

10 it.

11              MR. LARSON:

12                  That's all the questions I have.

13                  EXAMINATION

14 BY MR. BARRY:

15      Q.    I have a couple of questions.  My name

16 is Steve Barry.  I represent Palomar Insurance

17 Company.  You are here today as a representative

18 of Brister's Thunder Karts.  You understand that,

19 correct?

20      A.    Yes.

21      Q.    So the questions I'm going to ask you are

22 not really what Edward Cook knows, but what does

23 Brister's know.  And if for any reason you don't

24 know the answers to those questions, if you could

25 just tell me who the person who would be most

EXHIBIT
A

1  knowledgeable would be, I would appreciate it.

2  Because as you understand, a company is an entity

3  out there, but it has to work through people.  So

4  the only way we can take the deposition of a

5  company is to take the deposition of a person who

6  is most knowledgeable.  Now a couple of the

7  questions I'm going to ask you are really just

8  basic questions about this lawsuit.  First of all,

9  Brister's Thunder Karts has insurance or had

10  insurance at various points in time; isn't that

11  correct?

12      A.    That's correct.

13      Q.    At one point in time they had insurance

14  through North American Capacity Insurance Company;

15  is that correct?

16      A.    Yes.

17      Q.    What I would like to do is to show you a

18  copy of the North American Capacity Insurance

19  Company policy which was produced today.  Has

20  Brister's seen that before?

21      A.    Yes.

22      Q.    And that was contained in Brister's

23  files?

24      A.    Yes.

25      Q.    And that was given to them at the time

1  they purchased the insurance or thereabouts?

2      A.   I believe that to be the case.

3      Q.   Now on that policy of insurance, the

4  policy period is from October 12, 1995 to October

5  12, 1996; is that correct?

6      A.   Yes.

7      Q.   And the producer's name is American

8  Marketing Center; is that correct?

9      A.   Yes.

10      Q.   The policy was cancelled at some point in

11  time.  Brister's policy with North American

12  Capacity Insurance Company was cancelled I think

13  it was on July 29, 1996 or effective July 29,

14  1996; is that correct?

15      A.   I've heard that.

16      Q.   Is that Brister's understanding of when

17  the policy was cancelled?

18      A.   I believe that it is.

19      Q.   And after that, Brister's had another

20  policy of insurance through American Dynasty

21  Insurance Company; is that correct?

22      A.   I believe that's right.

23      Q.   And I think Mr. Larson attached a copy of

24  that policy in his Motion for Summary Judgment.

25               MR. LARSON:

```
 1                    No.   I think I attached the North
 2  American policy.   I didn't attach the American
 3  Dynasty policy.
 4                    MR. SCHWARTZ:
 5                    I attached both American Dynasty
 6  policies to my motion for judgment on the
 7  pleadings.  I did not mail y'all copies of it.
 8  But if you want them, I certainly could mail it to
 9  you.  I mailed you copies of all exhibits except
10  for the copies of the two policies and I think my
11  correspondence indicated to you that if you would
12  like a copy I would get them to you.  If you need
13  them now I can dig through these three files on
14  the floor here and get copies of them for you.
15                    EXAMINATION
16  BY MR. BARRY:
17     Q.   Actually my biggest question is Brister's
18  had a copy just like they had a copy of the North
19  American Capacity Insurance policy, they also had
20  a copy of the American Dynasty policy; is that
21  correct?
22     A.   I believe we did.
23     Q.   Is there any information that you have to
24  suggest that Brister's was not given a copy of the
25  American Dynasty Insurance policy?
```

```
 1      A.   No.
 2      Q.   And it was a complete copy of the policy
 3  just like we have a complete copy of the North
 4  American Capacity policy?
 5      A.   I haven't seen that, but we usually get
 6  copies of our insurance policies.
 7                    MR. BARRY:
 8                    Richard, could you attach a copy to
 9  the deposition?
10                    MR. SCHWARTZ:
11                    Yes, I can.
12                    EXAMINATION
13  BY MR. BARRY:
14      Q.   And if you had a copy of a policy and it
15  was involved in litigation you might give it to
16  your attorney for his keeping?
17      A.   A copy of it.
18      Q.   There is an attorney that appears in your
19  file, Mary Hamilton.  Do you know who Mary
20  Hamilton is?
21      A.   I do not.
22      Q.   Is it Brister's understanding that Mary
23  Hamilton of the Voorhies & Labbe' firm in
24  Lafayette was appointed to defend Brister's in the
25  LeBlanc case?
```

1    A.    No, I'm not.

2    Q.    Who would have that information?  Who

3  would be the person best qualified to provide

4  testimony in that regard?

5    A.    I'm not sure.  It would have to be

6  somebody I guess who had been with the company

7  back then.  You're talking about that letter that

8  was in one of these files?

9    Q.    You do have correspondence and you have

10  received correspondence, you being Brister's, from

11  Mary Hamilton at Voorhies & Labbe'-with regard to

12  the defense of this lawsuit; is that correct?

13    A.    I believe I saw one earlier today.

14    Q.    And it is your understanding that

15  somebody is defending Brister's, some lawyer is

16  defending Brister's other than Mr. Schwartz with

17  regard to the allegations brought by the LeBlancs

18  in their state court proceedings; is that

19  Brister's understanding as well?

20    A.    Yes.

21    Q.    And that person was appointed by your

22  insurance company after they received notice of a

23  claim; is that also Brister's understanding?

24    A.    I believe that's right.

25    Q.    And they have continued to represent

1    Brister's Thunder Karts throughout these

2    proceedings?

3        A.    That's my understanding.

4        Q.    And I think there are several bills in

5    there in fact from Voorhies & Labbe', the law firm

6    of Voorhies & Labbe' and perhaps Ms. Hamilton with

7    regard to the defense of the LeBlanc lawsuit; is

8    that correct?

9        A.    I believe there was.

10       Q.    And under the policy of insurance

11   Brister's Thunder Karts had maybe a $25,000

12   deductible which they were supposed to pay

13   attorney fees to their outside counsel; is that

14   correct?

15                    MR. LARSON:

16                    Which policy are we talking about?

17                    MR. BARRY:

18                    Certainly the North American

19   Capacity policy.

20                    MR. LARSON:

21                    That's the question you are asking

22   him under the North American Capacity policy was

23   there a $25,000 deductible?

24                    EXAMINATION

25   BY MR. BARRY:

```
 1      Q.    Actually I'm asking him is it your

 2   understanding that Brister's Thunder Karts was

 3   responsible for paying Voorhies & Labbe's defense

 4   bills under that insurance policy, particularly

 5   the North American Capacity Insurance policy?

 6      A.    It was my understanding that under some

 7   of these prior product liability insurance

 8   policies that we had to pay outside attorneys

 9   bills up to some amount and then after that we

10   didn't have to pay any more.

11      Q.    And if I were to tell you that amount is

12   $25,000 as reflected in correspondence contained

13   in the documents you've produced today, you

14   wouldn't have any reason to dispute that, would

15   you?

16      A.    I wouldn't.

17      Q.    We've also been provided a copy of the

18   American Dynasty Insurance policy or actually two

19   of them.

20                  MR.  SCHWARTZ:

21                  You have the replacement policy.

22   And then you have the subsequent renewal policy

23   there.

24                  MR.  BARRY:

25                  I would like to show you those two
```

```
 1  policies and ask you if those appear to be the
 2  policies.
 3                 MR. LARSON:
 4                 Do you want to mark those as
 5  exhibits?
 6                 EXAMINATION
 7  BY MR. BARRY:
 8     Q.   Yes.  They have exhibit three and exhibit
 9  four sticker on there.  If that's okay we'll just
10  stick with those two numbers.
11     A.   They appear to be.
12     Q.   When was Brister's first notified that
13  North American Capacity was denying coverage in
14  this case?
15     A.   I don't know that.
16     Q.   Do you have any documents that would
17  reflect when North American Capacity first told
18  you that they were denying coverage in this case?
19     A.   Not that I'm aware of.  This file was a
20  North American Capacity/LeBlanc file.  We were
21  keeping it all in one file.  So I didn't see
22  anything that I remember in that file that showed
23  me that.
24     Q.   Did Ms. Hamilton or another attorney at
25  Voorhies and Labbe' ever tell Brister's that North
```

1  American Capacity was denying coverage in this

2  case?

3        A.    I don't know.

4        Q.    Are you aware of any correspondence or

5  any documents from Ms. Hamilton or an attorney at

6  Voorhies & Labbe' informing Brister's Thunder

7  Karts that there would be no coverage in this

8  case?

9        A.    I'm not aware of that.

10       Q.    Did American Marketing Center ever tell

11  you that there was not going to be any coverage in

12  this case?

13       A.    Not that I know of.

14       Q.    Do you recall whether American Marketing

15  you being Brister's, did Brister's ever get any

16  notification from American Marketing Center with

17  regard to cancellation of coverage?

18       A.    I'm not aware of it.

19       Q.    I'd like to refer you to two documents

20  that were produced by you.  I think they were part

21  of P-2.  The first one is a fax by Palomar

22  Insurance Corporation to Lynn Graybill and ask you

23  to review that real quick.  And just to make the

24  transcript a little easier, Lynn Graybill, that

25  was the former CEO of Brister's Thunder Karts; is

```
 1  that correct?

 2       A.   Yes.

 3       Q.   And Palomar Insurance Corporation, they

 4  were an insurance broker; isn't that correct?

 5       A.   That's our insurance company.

 6       Q.   Do you know the difference between an

 7  insurance company and an insurance broker?

 8       A.   They are an insurance broker.

 9       Q.   They purchase insurance for Brister's; is

10  that correct?

11       A.   That's correct.

12       Q.   Or is that your understanding?

13       A.   That's my understanding.  They handle all

14  our insurance.

15       Q.   Could you read the message to Mr.

16  Graybill by Palomar Insurance Company?

17       A.   Yes.  "This is to confirm receipt of your

18  fax to our office regarding suit dating back to a

19  5-17-96 date of incident.  I am enclosing a copy

20  of the loss notice that was faxed to American

21  Marketing Center, along with the suit, for

22  immediate attention.  If you have any questions or

23  concerns, please feel free to give me a call at

24  the above number."

25       Q.   And American Marketing Center as we've
```

1  previously noted, that's the producer of the North

2  American Capacity Insurance Company policy; is

3  that correct?

4      A.    Yes.

5      Q.    And the General Liability Notice of an

6  Occurrence or Claim, this was a document that was

7  attached to that fax; is that correct?

8      A.    I believe that's right.

9      Q.    And I think in previous questioning you

10 indicated that the first notice you had, you being

11 Brister's, had with regard to the loss in this

12 matter, was when you were served with a citation

13 and a copy of the lawsuit in this case; is that

14 correct?

15     A.    I believe that to be right.

16     Q.    And in the Petition for Damages it had

17 the date of the alleged occurrence; is that

18 correct?  The date that the accident happened?

19     A.    I believe it did.

20     Q.    And Brister's Thunder Karts was aware of

21 the change in insurance from North American

22 Capacity to American Dynasty Insurance Company;

23 isn't that correct?

24     A.    I don't know.

25     Q.    Who would know that?  Who would be the

```
 1  person best qualified to talk about the change of

 2  insurance or the purchase of insurance at

 3  Brister's Thunder Karts?

 4      A.   What was the date of the change?

 5      Q.   It would have been in 1996.

 6              MR. SCHWARTZ:

 7              '97.

 8              MR. BARRY:

 9              I think it's '96.

10              MR. SCHWARTZ:

11              '97 wasn't it?

12              MR. BARRY:

13              July 29, 1996.

14              MR. D'AMOUR:

15              I thought it was.

16              MR. LARSON:

17              July 29, '96 was the cancellation.

18              THE WITNESS:

19              Maybe Mr. Graybill.  I don't know.

20              EXAMINATION

21  BY MR. BARRY:

22      Q.   He was the person that Palomar sent that

23  fax to?

24      A.   Yes.

25      Q.   Did Palomar ever prevent or instruct
```

1   Brister's Thunder Karts not to communicate with

2   North American Capacity Insurance Company,

3   American Marketing Center or American Dynasty

4   Insurance Company?

5       A.    Not that I'm aware of.

6       Q.    Are you aware of any requirement that

7   required Brister's Thunder Karts to go through

8   Palomar before contacting North American Capacity

9   Insurance Company, American Dynasty or American

10  Marketing Center?

11      A.    Any requirement?

12      Q.    Yes.

13      A.    I don't know of a requirement.  That's

14  our practice.  They are a broker.  But anything

15  that relates to the insurance we send it to Hank,

16  Palomar.

17      Q.    But if you wanted to you could contact

18  American Marketing Center?   .

19      A.    I'm not aware of anything that would

20  prohibit me from that.

21      Q.    Mr. Graybill was aware that notice was

22  being sent to American Marketing Center on August

23  21, 1997 by virtue of the fax Palomar sent to him;

24  is that correct?

25      A.    It appears he should have been.

1      Q.    Does Brister's have any other documents

2   in its possession with regard to any

3   communications between Palomar Insurance

4   Corporation and Brister's Thunder Karts other than

5   what you've produced here today?

6      A.    Not that I'm aware of.

7      Q.    Is there anyone else that would hold

8   those documents?

9      A.    No.

10     Q.    As a chief financial officer are you

11  presently in charge of insurance, purchasing

12  insurance and premiums and things like that?

13     A.    I sign off on it.

14     Q.    You approve the policies of insurance

15  that get placed for your company; is that correct?

16     A.    Yes.

17     Q.    And back in 1996 you think Mr. Graybill

18  would have been the person who was in charge of

19  that?

20     A.    Or it could have been Mr. Callegari.  But

21  the CEO is the final sign off.

22     Q.    Are you aware of any damages that

23  Brister's Thunder Karts has sustained as a result

24  of the notification to North American Capacity

25  Insurance Company?

```
 1        A.    I'm not sure what you are asking me.
 2        Q.    Has Brister's Thunder Karts suffered any
 3   loss as a result of the original notification of
 4   this accident or the LeBlanc loss going to
 5   American marketing Center versus going to American
 6   Dynasty?
 7        A.    I'm not aware that we have.
 8                     MR. BARRY:
 9                 That's all the questions I have.
10   Thank you.
11                     EXAMINATION
12   BY MR. D'AMOUR:
13        Q.    A couple of follow-up questions.   Is
14   there anybody currently employed with Brister's or
15   International Karts who was employed in 1996 to
16   your knowledge?
17        A.    I don't have knowledge of who you mean.
18   You mean corporate?
19        Q.    I'm talking about here in Roseland?
20        A.    There is a big manufacturing operation.
21   You're talking about corporate office type people?
22        Q.    Correct.
23        A.    I can't really answer that.   I don't know
24   how long everybody has been there.
25        Q.    So you can't answer whether or not there
```