FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 APR 19 PM 3: 28

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NORTH AMERICAN CAPACITY INSURANCE COMPANY | * * * | CIVIL ACTION |
| VERSUS | * * | NO. 00-0429 |
| BRISTER'S THUNDER KARTS. INC. | * * * * * | SECTION "L", MAG.2 JUDGE ELDON E. FALLON MAGISTRATE JOSEPH C. WILKINSON, JR. |

*********************************************************************

## AMERICAN DYNASTY'S
## FIRST SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
## NORTH AMERICAN'S MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

NOW INTO COURT, through undersigned counsel, comes American Dynasty who respectfully submits this Supplemental Memorandum in Opposition to North American's Motion for Summary Judgment.

**I.    North American Did Not Reserve Its Right To Deny Coverage To Brister's Thunder Karts.**

North American filed a Motion for Summary Judgment requesting the Court to declare that its insurance policy does not cover the claims made against Bristers' Thunder Karts (hereinafter "Thunder Karts"). American Dynasty opposed the summary judgment on the basis that North American waived its defense of non-coverage by providing a defense for almost three years before denying coverage. Most significantly, North American, who is presumed to have knowledge of the contents of its own policy, denied coverage on the basis

1

that the policy was cancelled at the time the claim was made, yet still provided a defense to Brister's for almost three years.

In its Motion for Summary Judgment, North American submitted no evidence supporting that it reserved its rights to deny coverage. Since American Dynasty filed its opposition, the corporate deposition of Thunder Karts was taken. At the deposition, Thunder Karts produced its entire file of the Leblanc lawsuit. The file did not contain a reservation of rights letter or any correspondence from North American indicating its intent to deny coverage.[1] Additionally, the corporate representative of Brister's testified that Thunder Karts never received any documentation regarding North American's intent to deny coverage or even reserving its right to deny coverage.[2]

It is well established under Louisiana law that when a conflict arises, and an insurer has knowledge of facts indicating non-coverage, **it must obtain a non-waiver agreement to reserve its right to deny coverage**.[3] Thus, "when an insurer with knowledge of the facts indicating non-coverage under the insurance policy, assumes or continues the insureds defense **without obtaining a non-waiver agreement to reserve its coverage defense, the insurer waives such policy defense**."[4]

It has already been established that North American waived its defense of non-coverage by waiting almost three years to deny coverage with the knowledge that no coverage existed at the time that suit was filed. Given the fact

---

[1] See: Attached Exhibit A, Deposition transcript of Brister's Thunder Karts, p. 16, lns 15-23.
[2] See: Attached Exhibit A, Deposition transcript of Brister's Thunder Karts, p. 41-42
[3] *Vargas v. Daniell Battery Manufac. Co., Inc.*, 93-2282 (La.App. 1st Cir. 12/29/94), 648 So.2d 1103.
[4] See: *Cassey v. Stewart*, 31-437 (La.App. 2nd Cir. 1/20/99), 727 So.2d 655, 658, quoting, *Steptore v. Masco Construction Co. Inc.*, 93-2064 (La. 8/18/94), 643 So.2d 1213.

2

that North American did not send a reservation of rights letter, there is no dispute that North American waived its defense of non-coverage.

Therefore, as a matter of law, North America is estopped from denying coverage to Brister's and North American's summary judgment should be denied.

Respectfully submitted,

ADAMS AND REESE LLP

_____
Ralph H. Wall (#22667)
Christopher A. D'Amour (#26252)
4500 One Shell Square
New Orleans, LA  70139
(504) 581-3234


### CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been served upon all counsel of record by placing a copy of same in the U. S. mail, postage prepaid, this ___17___ day of April, 2001.

_____
CHRISTOPHER A. D'AMOUR

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
* * * * * * * * * * * * * *
                           *
NORTH AMERICAN CAPACITY    *
INSURANCE COMPANY          *
                           *  NO. 00-429
         VS.               *  SECTION "L"
                           *  JUDGE FALLON
BRISTER'S THUNDER KARTS,   *  MAG. WILKINSON
INC.                       *
                           *
* * * * * * * * * * * * * *
```

       30(B)6 Deposition of BRISTER'S THUNDER KARTS, INC., taken on TUESDAY, APRIL 3, 2001, commencing at 10:00 A.M. and concluding at 11:30 A.M., in the LAW OFFICES OF RICHARD A. SCHWARTZ, 210 East Mulberry Street, Amite, Louisiana 70422.



DEFENDANT'S EXHIBIT A

Page 14

1 were concerned it might amount to a claim?
2         MR. SCHWARTZ:
3             When you refer to a claim you mean
4 personal injury?
5             EXAMINATION
6 BY MR. D'AMOUR:
7    Q. Correct.
8    A. None.
9    Q. So you've never had to consult with
10 counsel since you were with the company?
11   A. Not with relation to a personal injury.
12   Q. For what reasons have you had to consult
13 with legal counsel?
14   A. Corporate legal matters, attempting
15 collection of debts, responding to disgruntled
16 shareholders, thing like that that I call
17 corporate legal type things. Civil lawsuits.
18   Q. Is there someone else in your office who
19 might receive or learn about a personal injury
20 besides you or before you?
21   A. I doubt that would happen now because our
22 process is that when the mail comes in if it's
23 related to legal matters it goes to me.
24   Q. You say now. Was it different before
25 some period of time?

Page 15

1    A. I'm not exactly sure what the process was
2 exactly before. It's been what I've done since
3 I've been here.
4    Q. Again I hear you're saying now. Do you
5 have any knowledge that we're talking to each
6 other before you came it was done some different
7 type of method?
8    A. I believe and again this is based on my
9 understanding, is that the prior CFO received and
10 reviewed the legal matters as well.
11   Q. So that would be Mr. Jones before you?
12   A. Right.
13   Q. Is there any policy, written policy by
14 Karts International that confirms how this process
15 is supposed to occur?
16   A. Not that I'm aware of.
17   Q. And how did you learn of this process?
18   A. I was told that was how we would handle
19 it.
20   Q. And who told you that?
21   A. I don't know. I can't recall exactly.
22   Q. It was somebody --
23   A. It could have been Mr. Jones before he
24 left or it could have been Mr. Brister. I'm not
25 sure who told me.

Page 16

1    Q. Mr. Brister is the owner of the company
2 or is he the owner of Brister's Thunder Karts?
3    A. No. Mr. Brister is the chairman.
4    Q. What documents do you have with you today
5 with respect to what we had requested, the ones we
6 had requested?
7    A. I just have our file.
8    Q. Do you have copies for me as well?
9    A. I don't have.
10        MR. SCHWARTZ:
11           We haven't copied the file. You are
12 welcome to if we can go off the record you can
13 look through everything. We can give you time.
14           EXAMINATION
15 BY MR. D'AMOUR:
16   Q. Could I see what you have? Why don't you
17 tell me what you have first of all?
18   A. This is just a correspondence file and
19 this is the old file. It goes back to 1997. I
20 believe these to be our complete files. So what
21 I've been doing is any time I get any
22 documentation related to this whole case I just
23 drop it in this file.
24        MR. LARSON:
25           This file you are pointing to the

Page 17

1 correspondence file?
2         THE WITNESS:
3             These are all the files that I have
4 dealing with it.
5             EXAMINATION
6 BY MR. D'AMOUR:
7    Q. Let's do it like this: Let me ask you a
8 few questions. According to your testimony you
9 were not with International Karts at the time this
10 claim was filed or made; is that correct?
11   A. Right.
12   Q. So you have no personal knowledge with
13 respect to how the claim was registered or brought
14 into or notified or how the claim was notified to
15 Brister's?
16   A. That's correct.
17   Q. And do you know who that person was who
18 was with the company who first received
19 notification of the claim?
20   A. Based on my review of the file I believe
21 it was Lynn Graybill.
22   Q. Who was Lynn Graybill?
23   A. He was the chief executive officer at the
24 time.
25   Q. At the time of --

Page 38

Brister's Thunder Karts throughout these proceedings?

A. That's my understanding.

Q. And I think there are several bills in there in fact from Voorhies & Labbe', the law firm of Voorhies & Labbe' and perhaps Ms. Hamilton with regard to the defense of the LeBlanc lawsuit; is that correct?

A. I believe there was.

Q. And under the policy of insurance Brister's Thunder Karts had maybe a $25,000 deductible which they were supposed to pay attorney fees to their outside counsel; is that correct?

MR. LARSON:
Which policy are we talking about?

MR. BARRY:
Certainly the North American Capacity policy.

MR. LARSON:
That's the question you are asking him under the North American Capacity policy was there a $25,000 deductible?

EXAMINATION
BY MR. BARRY:

Page 39

Q. Actually I'm asking him is it your understanding that Brister's Thunder Karts was responsible for paying Voorhies & Labbe's defense bills under that insurance policy, particularly the North American Capacity Insurance policy?

A. It was my understanding that under some of these prior product liability insurance policies that we had to pay outside attorneys bills up to some amount and then after that we didn't have to pay any more.

Q. And if I were to tell you that amount is $25,000 as reflected in correspondence contained in the documents you've produced today, you wouldn't have any reason to dispute that, would you?

A. I wouldn't.

Q. We've also been provided a copy of the American Dynasty Insurance policy or actually two of them.

MR. SCHWARTZ:
You have the replacement policy. And then you have the subsequent renewal policy there.

MR. BARRY:
I would like to show you those two

Page 40

policies and ask you if those appear to be the policies.

MR. LARSON:
Do you want to mark those as exhibits?

EXAMINATION
BY MR. BARRY:

Q. Yes. They have exhibit three and exhibit four sticker on there. If that's okay we'll just stick with those two numbers.

A. They appear to be.

Q. When was Brister's first notified that North American Capacity was denying coverage in this case?

A. I don't know that.

Q. Do you have any documents that would reflect when North American Capacity first told you that they were denying coverage in this case?

A. Not that I'm aware of. This file was a North American Capacity/LeBlanc file. We were keeping it all in one file. So I didn't see anything that I remember in that file that showed me that.

Q. Did Ms. Hamilton or another attorney at Voorhies and Labbe' ever tell Brister's that North

Page 41

American Capacity was denying coverage in this case?

A. I don't know.

Q. Are you aware of any correspondence or any documents from Ms. Hamilton or an attorney at Voorhies & Labbe' informing Brister's Thunder Karts that there would be no coverage in this case?

A. I'm not aware of that.

Q. Did American Marketing Center ever tell you that there was not going to be any coverage in this case?

A. Not that I know of.

Q. Do you recall whether American Marketing you being Brister's, did Brister's ever get any notification from American Marketing Center with regard to cancellation of coverage?

A. I'm not aware of it.

Q. I'd like to refer you to two documents that were produced by you. I think they were part of P-2. The first one is a fax by Palomar Insurance Corporation to Lynn Graybill and ask you to review that real quick. And just to make the transcript a little easier, Lynn Graybill, that was the former CEO of Brister's Thunder Karts; is